ROBERT MCKERNAN, ESQ, (SBN 51060)
LAW OFFICES OF ALLEN & MCKERNAN, APC
5055 CANYON CREST DRIVE, SUITE 103
RIVERSIDE, CALIFORNIA 92507
TELEPHONE: (951) 333-5180
FACSIMILE:  (951) 880-1520
Email: rkmlegal2@gmail.com

MARC STEVEN COLEN (SBN 108275)
LAW OFFICE OF MARC STEVEN COLEN
3610 CENTRAL AVENUE, STE 400
RIVERSIDE, CA 92506
TELEPHONE: (951) 394-8625
Email: mcolen@colenlaw.com

Attorneys for Plaintiff
Damon Anderson

# THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

DAMON ANDERSON

       Plaintiff,

  vs.

COUNTY OF RIVERSIDE; STANLEY SNIFF, individually and as Sheriff for the Riverside Sheriff's Department; SAMEH SAWIRES, MD, Chief Medical Officer of Southwest Detention Center, in his individual and official capacities; Dr. VICTOR LAUS, Riverside County Correction Healthcare Medical Director, in his individual and official capacities; ANDREW PASCOE, RN, Supervisory Institutional Nurse at Southwest Detention Center, in his individual and official capacities; CORRECTIONAL DEPUTY CLAYTON PALMER; and DOES

Case No.:

1. Violation of Civil Rights [42 U.S.C. § 1983] Denial of and Deliberate Indifference to Medical Needs
2. Violation of Civil Rights [42 U.S.C. § 1983] Substantial Risk of Serious Harm
3. Violation of Civil Rights [42 U.S.C. § 1983] Excessive Force
4. Assault and Battery and Vicarious Liability [Cal. Govt. Code §§ 815.2(a), 820(a); Civil Code § 43]

**DEMAND FOR JURY TRIAL**

1

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

1through 25, inclusive,                    )
                                          )
            Defendants.

_____

## JURISDICTION AND VENUE

1.      This first three claims alleged herein arise under the United States Constitution and the Civil Rights Act pursuant to 42 U.S.C. Section 1983 and the Eighth and Fourteenth Amendment to the United States Constitution, wherein Plaintiff seeks to redress deprivations by Defendants and unknown DOE Defendants 1 through 25. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.

2.      At all times mentioned herein, all defendants were acting under color of state law, or in contravention of rights secured to Plaintiff by the Eighth and Fourteenth Amendments to the United States Constitution and the laws of the United States. This Court has supplemental jurisdiction over those claims asserted under state law by virtue of 28 U.S.C. Section 1367.

3.      Venue is proper in the Court because the parties reside in, and all incidents, events and occurrences giving rise to this action occurred in the County of Riverside, California.

4.      Plaintiff has exhausted all administrative remedies available to him prior to bringing this 42 U.S.C. § 1983 civil rights lawsuit within the meaning of the Prison Litigation reform Act, 42 U.S.C. § 1997(e)(a).

## PARTIES

5.      Plaintiff, DAMON ANDERSON, ("Anderson" or "Plaintiff"), at all times herein mentioned, was a resident of the County of Riverside, State of California.

2

Plaintiff is currently an inmate at Robert Presley Detention Center ("RPDC"), located in downtown Riverside, California. Plaintiff suffers from chronic back pain. Further, Plaintiff has gastritis and is infected with the Hepatitis C virus ("HCV").

6.     Defendant COUNTY OF RIVERSIDE ("the COUNTY") is a political subdivision of the State of California. At all times herein mentioned, Defendant COUNTY possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the Riverside Sheriff's Department, and particularly said Department's operation of the County Jails, their policies, procedures, practices, customs and usages related to their dealings with inmates as it relates to both the use of force and the provision of medical care.

7.     Defendant STANLEY SNIFF ("Defendant Sniff"), through January 7, 2019, was the Riverside County Sheriff and the head of the Riverside Sheriff's Department. He maintained this position at all times relevant to these claims. In doing the things alleged herein, Sniff acted under color of state law, and within the course and scope of his employment, and as an official policy maker for the County. As Sheriff, Defendant Sniff was vested with policy-making authority over actions such as the ones at issue in this claim.

8.     Defendant SAMEH SAWIRES, MD ("Dr. Sawires" or "Defendant Sawires") is the Chief Medical Officer at the Southwest Detention Center ("SWDC") in Murrieta, California. He is employed by the Riverside University Health System ("RUHS"), a public teaching hospital operated by the County of Riverside. He is alleged to have been acting, at all times relevant to this case, in his individual capacity and under the color of state law within the meaning of 42 USC Section 1983.

9.     Defendant ANDREW PASCOE, RN ("Nurse Pascoe" or "Defendant Pascoe") is a Supervisory Institutional Nurse working at SWDC. He is employed by RUHS. He is alleged to have been acting at all times relevant to this case, in his individual capacity and under the color of state law within the meaning of 42 USC Section 1983.

3

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

10. Defendant VICTOR LAUS ("Dr. Laus" or "Defendant Laus") was, during all times relevant herein, the Riverside County Correction Healthcare Medical Director. He is employed by the Riverside University Health System. He is alleged to have been acting, at all times relevant to this case, in his individual capacity and under the color of state law within the meaning of 42 USC Section 1983.

11. Defendant Correctional Deputy CLAYTON PALMER ("Deputy Palmer") is a Correctional Deputy with the Riverside Sheriff's Department. He maintained this position at all times relevant to these claims. In doing the things alleged herein, Palmer acted under color of state law, and within the course and scope of his employment.

12. Defendant DOES 1 through 25 are not known or identified at this time. On information and belief, Plaintiff alleges that each Doe is in some manner responsible for the wrongs alleged herein, and that each such Defendant advised, encouraged, participated in, ratified, directed or conspired to do, the wrongful acts alleged herein. When the true names and capacities of said Defendants become known, Plaintiff will seek relief to amend this complaint to show their true identities in place of their fictitious names as DOES 1 through 25. Defendants, and each of them, were the agents, employees and servants of every other Defendant. Defendants acted in the course and scope of said agency, service and employment at all relevant times.

## STATEMENT OF FACTS

13. The International Association for the Study of Pain, a worldwide medical organization, has stated that:

> "Pain is a major healthcare problem worldwide. Although acute pain
> may reasonably be considered a symptom of disease or injury,
> chronic and recurrent pain is a specific healthcare disease in its own
> right."

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

14.     The National Commission on Correctional Health Care, in a Position Statement adopted October 16, 2011and reaffirmed with revisions in April of 2018, stated, among other findings, that:

a) Most chronic pain can be managed through primary care clinicians. However, an interdisciplinary team approach is often beneficial, and specialty care, *including pain management*, should be available for patients whose function and chronic pain are not improved with treatment and for patients requiring end-of-life care.

b) *Policies banning opioids should be eschewed.* Opiates should be considered with caution after weighing all treatment options.

15.     Plaintiff Anderson has undergone six back surgeries in the past five years. Plaintiff has chronic and recurrent back pain and pain that radiates from his back into his buttocks, legs and feet.

16.     Plaintiff's first back surgery was in September of 2013 at Bakersfield Memorial Hospital in Bakersfield, California. The surgery was performed to repair an L4-L5 disc herniation ("First Surgery").

17.     Plaintiff's second back surgery was in October of 2013, also at Bakersfield Memorial Hospital. The surgery was performed to remove a hematoma that had formed near the surgical site following the first surgery in September 2013 ("Second Surgery").

18.     Plaintiff's third back surgery was in July of 2015 at San Joaquin Community Hospital in Bakersfield, California. A microdisectomy  was performed to remove a portion of the herniated disk between the L4and L5 vertebrae that was protruding and pressing up against the L5 nerve root and the nerve roots in the lumbar spine, a condition known as sciatica. Sciatica causes pain in the lower back, buttocks, thigh and genital region, with the pain further radiating into the feet. A laminectomy was also performed removing the lamina so as to relieve pressure on the spinal cord and nerve roots ("Third Surgery").

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

19.    Plaintiff's fourth surgery was in March of 2016, also at San Joaquin Community Hospital in Bakersfield, California. The surgery was performed to remove scar tissue that had wrapped around the L5 nerve root (Fourth Surgery").

20.    Plaintiff's fifth surgery was in March of 2017 at Riverside University Health System Medical Center ("RUHS") in Moreno Valley, California. Plaintiff underwent an S1 laminotomy to remove the lamina from the S1 vertebrae and a L5-S1 discectomy to remove a portion of a herniated disk ("Fifth Surgery").

21.    Plaintiff's sixth surgery was at Inland Valley Medical Center ("IVMC") in Wildomar, California. Plaintiff underwent an L5 S1 hemilamino foramenotomy discectomy on his left side to remove an 8mm disc herniation ("Sixth Surgery").

22.    In September or October of 2016, while in the San Luis Obispo County Jail, Plaintiff suffered severe abdominal pains and was throwing up blood. Plaintiff was taken to Sierra Vista Regional Medical Center in San Luis Obispo, California where he was diagnosed with Gastritis and stomach ulcers. The two major causes of Gastritis are: (a) a bacterium by the name of Helicobacter pylori and (b) nonsteroidal anti-inflamatory drugs ("NSAIDS").  NSAIDS include Aspirin, Ibuprofen, Motrin and Aleve, among others. NSAIDS can cause ulcers in the stomach and promote bleeding. In September or October of 2016, Plaintiff had already undergone four back surgeries. As part of his medicinal pain regimen, Plaintiff was taking NSAIDS for his back pain. After this episode, he was advised to no longer take NSAIDS. From and after this medical episode, Plaintiff has attempted to avoid taking NSAIDS for pain management. Plaintiff's California Department of Corrections ("CDC") medical records and Riverside County jail medical records state that Plaintiff has had gastrointestinal problems and stomach ulcers.  Plaintiffs RUHS health records state that he is allergic to NSAIDS.

23.    Plaintiff was diagnosed with Hepatitis C in 2007. Hepatitis C is an infection of the liver that is caused by the hepatitis C virus, a highly contagious virus that is passed through the blood. All people have a risk of liver problems when using acetaminophens, but the risk is higher for those with hepatitis C. Plaintiff has avoided

6

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

taking acetaminophen ever since being diagnosed with Hepatitis C. Plaintiff's CDC medical records and Riverside County Jail records reflect that Plaintiff has Hepatitis C.

24. Plaintiff was booked into the Smith Correctional Facility in Banning, California on February 14, 2017. Plaintiff notified his jailers of his disabilities related to his back problems and that he was using a cane, wheelchair and back brace when not incarcerated. Plaintiff advised his jailers that he was disabled and that his treatment and housing should be in compliance with the Americans With Disabilities Act ("ADA"). Plaintiff's Riverside County Jail ("RCJ") medical records state that he is to be housed in ADA housing. There is a notation in his RCJ medical records as of February 22, 2017 that Plaintiff needs a walker.

25. Plaintiff was transferred to the Riverside County Jail in Indio, a facility that has no ADA housing. On February 18, 2017 Plaintiff slipped and fell in the non-ADA shower. The shower had no seat for use while showering nor hand rails or grab bars for use in maintaining ones balance and leveraging oneself from a seated position to an upright position. Plaintiff complained of back pain and was taken to Eisenhower Medical Center emergency room in Rancho Mirage, California. Plaintiff underwent an MRI which showed nerve impingement at the L5-S1 as the left lateral recess was narrowing and contacting the traversing left S1 nerve root, causing back pain and pain in the lower extremities. Plaintiff's discharge prescriptions included: (a) Tramadol Oral tablet 50mg, one tablet orally every six hours, twenty five tablets; and (b) Gabapentin Oral capsule 300mg, one capsule by mouth every 12 hours, thirty capsules. Plaintiff requested the prescribed medications from jail medical staff on February 19, 2017. The prescriptions were never filled by the Indio jail medical staff.

26. On February 21, 2017, in the late afternoon, Plaintiff was in his cell throwing up blood, anxious, hyperventilating and complaining of pain and discomfort below his ribs in the area of his upper abdomen. Plaintiff had previously been diagnosed with gastritis in September or October of 2016. Plaintiff was taken to the emergency room at JFK Memorial Hospital, Indio, California. The attending physician diagnosed Plaintiff

7

with hematemesis, which is the clinical term for the vomiting of blood. The examining physician recommended a gastro intestinal follow up as the throwing up of blood can be caused by gastritis. Plaintiff had previously been diagnosed with gastritis in 2016.

27. On February 23, 2017, still housed at the Indio Jail in a non-ADA housing unit, Plaintiff fell attempting to climb to the top bunk of a three tier bunk bed. Although the jail medical records state that Plaintiff was aware of the need to be in a bottom bunk, all bottom bunks and middle tier bunks in the unit were occupied by other inmates. Plaintiff was transported to the Eisenhower Medical Center emergency room where a cat scan of the lumbar spine was performed. The examining physicians report states that no new fractures were noted, that Plaintiff is suffering from low back pain and should be continued on the previously ordered pain medications, Tramadol and Gabapentin. Plaintiff's RCJ medical records dated February 24, 2017 state: "Returned from Eisenhower ER, diagnosis low back pain, no new fracture, no change from MRI. Recommendations to return back to jail, continue previous pain meds Tramadol/Gabapentin as dictated from last visit." Upon returning to the Indio Jail, medical staff continued to fail to order the prescribed pain medication. Plaintiff alleges that the pain medication given by the jail medical staff was Advil and/or Motrin, Nsaids that aggravate his ulcers and gastrointestinal condition.

28. On February 27, 2017, Plaintiff complained of urinary retention. Indio Jail medical staff, using a catheter kit, catheterized Plaintiff and Plaintiff was able to void his bladder. After discussions of Plaintiff's medical condition with defendant Dr. Laus, Plaintiff was transported to RUHS for further evaluation.

29. At RUHS Plaintiff was administered a CT scan and an MRI of his lumbar spine. The tests showed a moderate disc protrusion of approximately 8 mm to the left of midline at the L5 S1 level causing posterior displacement of the left S1 nerve root. Plaintiff was admitted to surgery on March 16, 2017. Plaintiff underwent an S1 laminotomy and an L5-S1 discectomy, his fifth back surgery.

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

30.    Plaintiff was discharged from RUHS back to RPDC on March 30, 2017. Plaintiff's discharge medications from RUHS, among others, were:

        a.) Abilify, 5 mg for treatment of depression;

        b.) Lioresal, 10 mg for muscle spasms;

        c.) Gabapentin, 300 mg, for treatment of nerve pain;

        d.) Percocet, 325 mg for relief of severe pain;

        e.) Tramadol, 100 mg for relief of moderate to severe pain.

Plaintiff remained at RPDC until April 21, 2017. While at RPDC, Dr. Montenegro, Chief Medical Officer at RPDC, allowed Plaintiff to take the pain medication Tramadol to relieve his severe back pain.

31.    On April 21, 2017, Plaintiff was transferred from RPDC to the South West Detention Center. At RPDC Plaintiff was housed in an ADA compatible cell. At SWDC Plaintiff was housed in A-Pod, Cell 02, which was not ADA compliant. Plaintiff advised Sergeant Koury of his concerns that there was no seat in the shower for people such as himself to use, nor were there any hand or grab rails for disabled prisoners. Sergeant Koury advised Plaintiff that his cell met ADA guidelines. When Plaintiff attempted to give Sergeant Koury a Grievance Form, she would not accept the form.

32.    On April 24, 2017, Plaintiff was seen by Dr. Sameh Sawires, Chief Medical officer of SWDC (Defendant Sawires or Dr. Sawires). Defendant Sawires disallowed Plaintiff from receiving the pain medication, Tramadol, a pain medication ordered by the Doctors at RUHS upon Plaintiff's discharge from RUHS and a pain medication that Dr. Montenegro authorized while Plaintiff was housed at RPDC.

33.    On April 25, 2017, Plaintiff was transported to RUHS and seen by the Doctors in the Spine Clinic. Upon discharge, the Doctors in the Spine Clinic ordered the pain medication Tramadol for Plaintiff for fourteen (14) days and requested that Plaintiff return to the Spine Clinic in two weeks. Defendant Sawires followed the recommendation for Tramadol.

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

34.    On May 9, 2017, Plaintiff returned to the RUHS Spine Clinic and was seen by Dr. Silvero. Dr. Silvero recommended a repeat MRI with gadolinium enhancement in order to differentiate the possible causes of the spinal condition affecting Plaintiff. Dr. Silvero also recommended tramadol as a pain reliever. Neither recommendation was followed by Defendant Sawires. Plaintiff alleges that he was given Tylenol, which is an acetaminophen that could potentially damage Plaintiff's liver due to his previous bout with Hepatitis C.

35.    On May 16, 2017, while in the non ADA shower at SWDC, Plaintiff fell causing pain from his right hip to radiate all the way down his left leg. Plaintiff is supposed to be housed in an ADA compliant cell, which would have a seat in the shower, no step to cross over in order to get into the shower and hand rails to grab in the event the inmate loses his balance and is in jeopardy of falling. If Plaintiff had been housed in ADA compliant housing, this injury would not have occurred.

36.    Plaintiff was brought to the SWDC medical office in a wheelchair complaining of pain due to the fall in the shower. After twelve hours of constant pain, Plaintiff was transported to the RUHS Spine Clinic. The RUHS medical staff assessment of Plaintiff was that Plaintiff was suffering from chronic pain arising out of the back surgery performed at RUHS on March 16, 2017. The orthopedic surgeon at RUHS recommended an MRI of the lumbar spine with and without contrast in order to identify the condition causing the Plaintiff's pain. A prescription for Norco was further recommended to relieve Plaintiff's pain. Defendant Sawires refused to order the MRI and would not allow Norco as a pain reliever for Plaintiff.

37.    On May 19, 2017, Plaintiff again fell exiting the non-ADA shower hitting his head and right hip on the cell bench. Plaintiff rated the pain at a 10 on a scale of 1-10, with 10 being the highest pain level. Plaintiff was taken by ambulance to the emergency room ("ER") at Rancho Springs Medical Center in Murrieta. Plaintiff begged the emergency room Doctor to perform an MRI of the lumbar region of his spine, advising that his orthopedic specialist had recommended an MRI on both May 9, 2017 and May

10

17, 2017. The ER Doctor called SWDC and spoke with Defendant Pascoe. Defendant Pascoe advised the ER Doctor that Plaintiff was just being manipulative, that Plaintiff has a history of manipulative behavior and was just trying to obtain drugs to get high. The ER Doctor did not order the MRI.

38.    Plaintiff was returned to SWDC in the evening hours of May 19, 2017. While still in the ambulance and at the transportation area of SWDC, Plaintiff suffered a seizure. Plaintiff was sent back to Rancho Springs Medical Center ER. In the early morning hours of May 20, 2017 and after treatment in the ER, Plaintiff was returned to SWDC.  Dr. Montenegro ordered Keppra, 500 mg to be taken twice daily for fifteen days. Keppra is an anti-seizure medication. Plaintiff received the medication.

39.    In the afternoon hours of May 21, 2017, while in his cell, Plaintiff fell while using his walker. Deputies were called and he was helped to his bed. He was administered 10mg of flexeril, a muscle relaxant used in addition to rest and physical therapy. Flexeril is prescribed for short term relief for muscle spasms associated with acute, painful musculoskeletal conditions. A short time thereafter, and confirmed by Plaintiff's cellmate, Plaintiff fell from his bunk to the concrete floor in his cell. Deputies were called to the cell to administer aid to Plaintiff. Plaintiff appeared to be in an altered state of consciousness, unable to be aroused and non-responsive to external stimuli. Plaintiff was transported to Rancho Springs Medical Center ER for treatment. Late in the evening of May 21, 2017, Plaintiff returned to SWDC.

40.    Thereafter, on practically a daily basis, Plaintiff advised medical staff that the existing course of treatment for pain relief was not effective, that he was in constant pain and that Tylenol and ice packs do not help with the pain. When explaining the constant pain Plaintiff was suffering, Dr. Sawires commented to the effect: "Well, you're in jail. You should not commit crimes if you want good medical treatment."

41.    On June 16, 2017, Plaintiff asked Defendant Pascoe the status of his ordered MRI. Defendant Pascoe notified Plaintiff that the MRI is pending. Defendant Pascoe then gratuitously offered the following comment: "Why are you such a nuisance. Grow

11

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

up. There is nothing wrong with you. We will not give you drugs so you can get high." Plaintiff was in constant intolerable pain and commenced a hunger and water strike to try and get the MRI completed. The hunger and water strike was discontinued by Plaintiff on June 17, 2017.

42.    On June 26, 2017, Plaintiff was transported to RUHS complaining of nausea, dizziness, diarrhea and blood in his stool. A colonoscopy was performed and on June 28, 2017, Plaintiff was returned to SWDC.

43.    On June 30, 2017 Plaintiff was in extreme pain. Between June 28th and June 30th, 2017, Plaintiff was left to crawl around in his cell begging for help. In the early morning hours of June 30, 2017, Plaintiff's condition was assessed by RN Daniel Riddle. Nurse Riddle's notes show that Plaintiff complained of numbness to his left foot and lower left leg. Plaintiff further complained of a throbbing and dull pain to his lower left back area, with a sharp radiating pain down his left leg, all of which Nurse Riddle confirms is consistent with previous pain reported by Plaintiff.

44.    In Plaintiff's medical records, Defendant Sawires has an entry on June 30, 2017 that states that he attempted to see Plaintiff, but that Plaintiff refused to see him. What in fact occurred was a conversation with Defendant Pascoe in which Plaintiff asked Defendant Pascoe for help. Defendant Pascoe responded that they should see Dr. Sawires. Plaintiff agreed and asked Defendant Pascoe for a wheelchair. Defendant Pascoe said no, if you can't walk, Dr. Sawires won't see you. Due to the numbness in his left foot and lower left leg and the sharp pain radiating down his left leg, Plaintiff was able to walk only a short distance and would not have been able to walk to Dr. Sawires office. During Plaintiff's entire stay at SWDC, Dr. Swaires never administered a physical examination of Plaintiff. Yet he continually failed to follow the recommendations of the RUHS Spine Clinic specialists that treated and examined Plaintiff on a continual basis.

45.    Around 3:00 p.m. on June 30, 2017, Plaintiff crawled to the shower area in his cell, pushed the hot water button and lay on the floor. It was at this time that Plaintiff

12

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

decided to take his life, reasoning that death must be better than what he was suffering. Plaintiff wrote a suicide note asking that someone call his Mother and Wife and explain that he just could no longer handle the pain. He then put a bed sheet around his neck and hooked it to the shower door.

46. Deputies saw Plaintiff hanging from the shower door and immediately entered the cell and lowered Plaintiff to the floor of the cell. Plaintiff was non-verbal but breathing. Plaintiff was transported via ambulance to Inland Valley Medical Center in Wildomar, California.

47. Plaintiff was seen by the RUHS Spine Clinic on May 9, 2017. The Spine Clinic recommended an MRI for Plaintiff. Plaintiff was in a hospital on five separate occasions after May 9, 2017: (1) May 16th – RUHS Spine Clinic; (2) May 19th - Rancho Springs Medical Center; (3) May 20th – Rancho Springs Medical Center; (4) May 21st – Rancho Springs Medical center; and (5) June 26th – RUHS. At no time during these five hospital visits was an MRI ordered for Plaintiff.

48. Upon admission to Inland Valley Medical center, the attending physician, Dr. Daniel Friedlich ordered an MRI. The MRI showed a very large disc herniation on the left side of L5-S1 which appeared to significantly displace the S1 nerve. Dr. Friedlich's notes indicate that Plaintiff complains of lower back pain and pain in the posterior aspect of the left leg to the calf and the heel. The notes further indicate that the pain was significant and Plaintiff was unable to mobilize. After discussing the risks involved in surgery, Plaintiff agreed with Dr. Friedlich to undergo surgery, his sixth back surgery, and proceed with a left-sided L5-S1 hemilamina foraminotomy discectomy for the treatment of left leg pain.

49. Prior to the surgery, it is alleged by Plaintiff that Dr. Friedlich spoke with both the medical staff at SWDC and medical staff at RUHS. It is further alleged by Plaintiff that the medical staff at both RUHS and SWDC advised Dr. Friedlich to return Plaintiff to SWDC without performing an operation, as Inland Valley Medical Center was not on the approved list of County hospitals authorized to provide medical services

13

to County jail inmates and that Inland Valley Medical Center would not be compensated if the operation were to be performed. The operation was performed and Plaintiff was discharged to RUHS on July 11, 2017.

50.    After the surgery at Inland valley Medical Center, Plaintiff was feeling much better with significantly less pain. In mid-July 2017, Plaintiff was transferred to the Indio Jail facility in Indio, California. Plaintiff felt well enough that he requested non-ADA housing and that he be allowed his allotted recreation time. However, in late October to early November of 2017, Plaintiff began to experience severe back pain with sharp pain radiating down his left leg. Plaintiff advised the Indio Jail Facility that he required ADA housing once again. The facility refused to transfer him to ADA housing.

51.    On December 15th, 2017, Plaintiff requested Judge Benjamini to order the Indio Jail Facility to review Plaintiff for ADA housing. On December 27, 2017, at the Indio Jail Facility, Correctional Deputy Ruiz stated in the classification notes that Plaintiff is an "Armstrong" inmate and needs to be transferred to a facility that can better meet his ADA needs. Plaintiff was transferred from the Indio Jail Facility to SWDC in order to accommodate Plaintiff's ADA housing requirement. SWDC Deputy Ragan, disregarding the notes as to why Plaintiff was returned to SWDC, determined that Plaintiff does not require ADA housing and placed Plaintiff in a non-ADA cell. Plaintiff was not housed immediately in ADA housing.

52.    On January 3, 2018 Plaintiff was seen by Nurse Practitioner Richardson who directed that Plaintiff should be placed in ADA housing. Plaintiff was advised by Deputy Taylor that when a bed was available in ADA housing, Plaintiff would be moved. However, there was at that time an ADA housing unit available, namely cell 50.

53.    On January 5, 2018, Plaintiff fell in the non-ADA shower. Plaintiff was carried by two inmates back to his cell. Plaintiff was sent to RUHS for pain medication and x-rays. Upon return to SWDC, Plaintiff was placed back in non-ADA housing.

54.    On or about January 9, 2018, the pain subsides sufficiently for Plaintiff to use a walker to see Dr. Cudal, the then current medical officer at SWDC. Dr. Cudal agrees

14

that Plaintiff requires ADA housing and Plaintiff is finally moved to the appropriate ADA housing.

55.    On February 5, 2018, Plaintiff was moved out of ADA housing and placed in A-Pod cell 7, which is the same area where Plaintiff attempted to take his life because of his pain in June of 2017. Plaintiff became anxious and consulted with Dr. Hyer. Dr. Hyer had Plaintiff transferred to RPDC.

56.    On February 20, 2018, Plaintiff was seen by Dr. Adam Yuan at the RUHS Spine Clinic. Dr. Yuan recommended pain management referral for chronic back and sciatica pain and physical therapy for gait and balance and back strengthening exercises. Dr. Yuan further recommended Tramadol for pain relief until such time as Plaintiff is able to be seen by pain management. At this time, Defendant Dr. Laus was the Chief Medical Officer at RPDC. On February 23, 2018, Plaintiff was seen by Nurse Practitioner Martha Okwor who advised Plaintiff that, per Dr. Laus, there would be no Tramadol for pain medication nor would there be a referral to pain management. At no time in the calendar year 2018 did Dr. Laus have Plaintiff referred to pain management nor allow Plaintiff to alleviate his pain with Tramadol.

57.    On February 28, 2018, while being re-housed, Plaintiff was placed in Intake Cell No. 4. Plaintiff believes he had a seizure as when he came out of the seizure, he was disoriented and surrounded by a number of officers. Plaintiff was startled by the number of officers. When Plaintiff tried to sit up, a number of the officers jumped on him. Plaintiff felt blows to his back and head area and a taser was shoved into his back and told that if he moved he would be tased. Plaintiff was handcuffed, shackled and dragged out of Intake Cell No. 4. He was placed in a wheelchair and taken to the nurse's office. After being examined by the nurse, Corporal Morales asked the other deputies if Plaintiff could walk. Defendant Palmer answered to the effect: "Yes, he can walk. He just doesn't want to." Defendant Palmer was aware that Plaintiff was classified as disabled and requires either a walker or wheelchair to move around and in fact had transported Plaintiff to the nurse's office in a wheelchair. Upon leaving the nurse's

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

office, Defendant Palmer lifted Plaintiff out of the wheelchair, held Plaintiff by the handcuffs on his left arm while a second deputy, Defendant Doe No. 1, held Plaintiff by the handcuffs on his right arm and a third deputy, Defendant Doe No. 2, lifted Plaintiffs legs from the floor by holding Plaintiff's leg irons. Plaintiff was carried in this manner from the nurse's office all the way back to Intake Cell No. 4. Lifting an inmate with his handcuffs while the inmate is handcuffed with his arms behind his back and his feet being held off the ground is referred to as "chicken-winging" the inmate. Chicken-winging causes severe pain and there is no penal justification for employing such a movement. Plaintiff was screaming in pain the entire time he was being transported from the nurse's office back to Intake Cell No. 4. Plaintiff was seen by Dr. Mejia at RPDC, He suffered damage to his C-6 nerve and has symptoms of a cervical herniated disc. Plaintiff continues to have numbness and tingling along with pain that radiates down the triceps of the right arm and into the middle finger of the right hand.

58.    On April 4, 2018, Plaintiff was seen by Dr. Laus. Dr. Laus reiterated that there would be no new course of action, that Tramadol would not be authorized for pain relief and that there would be no referral to pain management.

59.    On May 3, 2018 Plaintiff asked Nurse Practitioner Martha Okwor if he could get a lidocaine patch for his back pain. She advised Plaintiff that, per Dr. Laus, no lidocaine patch would be allowed for back pain.

60.    On or about June 30, 2018, the one year anniversary of Plaintiff's attempted suicide, Plaintiff began suffering panic attacks. The panic attacks and anxiety were so intense that Plaintiff suffered flashbacks, reliving the experience of being in so much pain that would cause him to attempt to take his life. Plaintiff met with Dr. Anthony, a mental health psychiatrist. Dr. Anthony prescribed 2mg of ativan in order for Plaintiff to relax. Nearly every day, for ten straight days, Plaintiff met with three clinical therapists at the jail, known to Plaintiff only by their first names: Megan, Michelle and Marquita. On July 4th, 2018 Plaintiff had a panic attack that was so severe that Nurse Marlin believed Plaintiff was having a heart attack. Plaintiff was sent to RUHS by ambulance

16

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

for treatment. The ER Doctor at RUHS recommended that Plaintiff follow up with mental health. Plaintiff has now been diagnosed with PTSD.

61.    On December 20, 2018, Plaintiff advised Judge Benjamini, a Judge of the Riverside Superior Court in Indio, California, that he was in such pain that he would not be able to make it through a trial. On January 3, 2019 a hearing was held before Judge Benjamini. Riverside County Counsel was ordered to investigate Plaintiff's allegations of inadequate medical care. Plaintiff signed a waiver so that Deputy County Counsel Kelly Moran could review Plaintiff's medical records. Plaintiff now receives a lidocaine patch for his back pain along with the nerve pain medication, Lyrica.

62.    In March of 2013, Quinton Gray, and nine other inmates housed in the Riverside County jail system, sued the County of Riverside for themselves and on behalf of "all prisoners who are now, or will be in the future, subjected to the medical and mental health policies and practices of Riverside County." In addition, the parties stipulated to an additional subclass of …"all prisoners who are now, or will be in the future, subjected to policies and practices of the Riverside jails regarding specialized or sheltered housing for prisoners due to their mobility impairments and need for assistive devices, and the provision and confiscation of accommodations for prisoners with mobility impairments…". A Consent Decree was entered into by Plaintiffs and the County of Riverside on November 24, 2015. Pursuant to the Consent Decree, Plaintiff and the County of Riverside negotiated a Remedial Plan, with the Remedial Plan being designed to meet the minimum level of health care necessary to fulfill the County of Riverside's obligations under the eighth and fourteenth amendments, as well as to ensure non-discrimination against inmates with disabilities in the areas addressed by the Plan, as required by the ADA and Section 504 of the Rehabilitation Act. The Remedial Plan, labeled Appendix A, was attached to the Consent Decree.

63.    The Remedial Plan, under Section II B 1, Specialty Care provides in pertinent part that:

"Within three months of the date that the consent decree is issued by the

17

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and procedures, as determined by the Medical provider, are provided *immediately*;"

64.   On January 18, 2019, Plaintiff was seen by the Doctors at RUHS Spine Clinic, who are medical specialists in the field of spinal pain treatment. The medical providers ordered an S-1 nerve block to be done "Stat", which in medical terminology means "immediately", Tramadol for pain relief and continued pain management consultations. The Doctor's notes further state that if the S-1 nerve block is ineffective, a spinal fusion surgery should be performed. As of the date of the filing of this Complaint, the S-1 nerve block has not been performed, the spinal fusion surgery has not been further discussed, Tramadol has not been given for pain relief and further pain management consultations have not occurred. Plaintiff has been advised by medical staff at RPDC that the S-1 nerve block procedure is out "to bid".

## FIRST CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS [42U.S.C. §1983]

### DENIAL OF AND DELIBERATE INDIFFERENCE TO MEDICAL NEEDS

**(By Plaintiff Against All Defendants Except Correctional Deputy Clayton Palmer)**

65.   Plaintiff hereby incorporates and re-alleges paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.   Plaintiff has undergone six back surgeries since September of 2013. Without proper pain medication and pain management therapy, Plaintiff suffers from Chronic and substantial pain.

67.   Plaintiff is a pre-trial detainee currently housed at RPDC. The Supreme Court has held that prison officials "deliberate indifference to serious medical needs of prisoners" violates the Cruel and Unusual Punishment Clause of the Eighth Amendment. A serious medical need exists if the failure to treat a prisoner's condition could result in

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

further significant injury or the "unnecessary and wanton infliction of pain". The existence of any injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities or the existence of chronic and substantial pain, for example, would indicate that a prisoner has a "serious" need for medical treatment *Estelle v. Gamble*, 429 U.S. 97, 104(1976). Even though a pretrial detainee's claims arise under the due process clause of the Fourteenth Amendment, The Eighth Amendment guarantees provide a minimum standard of care for determining rights as a pretrial detainee, including rights ...to medical care *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Circuit 1996).

68. Defendants, and each of them, knew that Plaintiff faced a substantial risk of serious harm and the unnecessary and wanton infliction of pain by not following the recommendations of Plaintiff's medical specialists in the field of pain management;

69. Defendants Sawires, Defendant Laus and Defendant Pascoe consciously disregarded that risk by not taking reasonable steps to treat Plaintiff's serious medical need, such that Plaintiff would not suffer unnecessary and wanton infliction of pain.

70. Defendant Sawires, Defendant Laus and Defendant Pascoe were acting, or purporting to act, in their official duties.

71. Plaintiff was harmed and, for a period of close to two years, has suffered the "unnecessary and wanton infliction of pain" arising out of the defendants failure to follow the recommendations of Plaintiff's pain management specialists.

72. The Defendant's conduct was a substantial factor in causing the Plaintiff's harm.

73. Claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an *objective* deliberate indifference standard. *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Circuit 2016). Based thereon, the elements of a pretrial

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are:

a) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

b) those conditions put the plaintiff at substantial risk of suffering serious harm;

c) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and

d) by not taking such measures, the defendant caused the plaintiff's injuries. *Castro*, 833 F.3d at 1071; *Gordon v. County of Orange*, 888 F.3d 1118.

## SECOND CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS [42U.S.C. §1983]

### SUBSTANTIAL RISK OF SERIOUS HARM

**(By Plaintiff Against All Defendants Except Correctional Deputy Clayton Palmer)**

74. Plaintiff hereby incorporates and re-alleges paragraphs 1 through 73 of this Complaint as though fully set forth herein.

75. Plaintiff's jail and medical records state that Plaintiff is disabled and is to be housed in ADA housing. During the time frame from February 18, 2017 to the date of the filing of this Complaint Plaintiff has, on numerous occasions, been housed in a non-ADA cell.

76. Defendant's failure to properly house Plaintiff in ADA housing created a substantial risk to Plaintiff's health, safety and well being.

77. Defendant's knew that their conduct created a substantial risk of serious harm to Plaintiff's health or safety. In fact, Plaintiff has fallen while in the shower of his non-

20

ADA assigned cell on four separate occasions. On each occasion, there was no seat in the shower for Plaintiff to sit on nor any hand rails for Plaintiff to grab to steady himself and prevent a fall. On each occasion, Plaintiff was taken to a hospital for treatment.

78.   Defendant's disregarded the substantial risk of serious harm by failing to house Plaintiff in ADA housing.

79.   There was no reasonable justification for Defendant's failure to act and place Plaintiff in appropriate ADA housing.

80.   Defendants were performing their official duties when they failed to act.

81.   Plaintiff was harmed and suffered injury.

82.   Defendant's failure to act was a substantial factor in causing Plaintiff's harm.

## THIRD CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS [42U.S.C. §1983]

### EXCESSIVE FORCE

**(By Plaintiff Against Defendant Correctional Deputy Clayton Palmer and Does 1-2)**

83.   Plaintiff hereby incorporates and re-alleges paragraphs 1 through 82 of this Complaint as though fully set forth herein.

84.   Defendant Palmer and Does 1 and 2 used excessive force against Plaintiff by chicken-winging a shackled and handcuffed Plaintiff from the nurse's station back to intake cell No. 4.

85.   The force used by Defendants Palmer and Doe 1 and Doe 2 was excessive;

86.   Defendant Palmer and Defendants Doe 1 and Doe 2 were acting, or purporting to act in the performance of their official duties.

87.   Plaintiff was harmed and continues to suffer pain in his right arm.

88.   Defendant Palmer and Defendants Doe 1 and Doe 2's use of excessive force was a substantial factor in causing Plaintiff's harm.

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

# FOURTH CAUSE OF ACTION

## ASSAULT AND BATTERY AND VICARIOUS LIABILITY

### [Cal. Govt. Code §§815.2(a), 820(a); Cal. Civil Code §43]

### (By Plaintiff Against the County of Riverside, Stanley Sniff, Defendant Correctional Deputy Clayton Palmer and Doe 1 and Doe 2)

89.   Plaintiff hereby incorporates and re-alleges paragraphs 1 through 88 of this Complaint as though fully set forth herein.

90.   All claims asserted herein against the County are presented pursuant to the County's vicarious liability of municipal employees undertaken in the course and scope of their employment pursuant to Cal. Gov. Code §§815.2(a), 820(a), and Cal. Civil Code §43.

91.   On February 28, 2018, Defendants Palmer, Does 1 and Doe 2, and others, while acting in the course and scope of employment with defendant County, used excessive and unreasonable force against Plaintiff by acts which included violently hitting Plaintiff in his back and head area, having a taser shoved in his back with the threat that he would be tased if he moved and being chicken winged from the nurses office back to Intake Cell No. 4.

92.   After being assaulted and battered as described herein, Plaintiff was seen by Dr. Mejia at RPDC.

93.   At no time during the course of events described herein did Plaintiff pose any Reasonable threat of violence to Defendant Palmer and Defendants Doe 1 and Doe 2 nor did he do anything to justify the force used against him, which was excessive, unnecessary and unlawful.

94.   Plaintiff is informed and believes and thereon alleges that Defendants Palmer, Doe 1 and Doe 2, and each of them, failed to exercise reasonable failed to exercise reasonable and ordinary care in committing the acts alleged herein by actions and inactions which include but are not limited to, negligently using excessive and unreasonable physical force upon Plaintiff, when the same was unnecessary and

22

unjustified, negligently failing to determine that Plaintiff did not pose a significant threat of physical harm to any person when he was assaulted and battered, intentionally inflicting physical injury on the person of Plaintiff as described.

95.    Plaintiff is informed and believes and thereon alleges that before February 28, 2018, individual employees of Defendant County, while working in the course and scope of their employment with Defendant County, negligently hired, trained, supervised and employed and managed heretofore unknown Defendant Doe deputy(s), in that said employees of Defendant County, knew or in the exercise of reasonable diligence, should have known, that said deputies were dangerous and violent employees, prone to provoke and initiate physical confrontation without reasonable justification, and in amanner that demonstrates callous disregard for the rights and safety of citizens, and assault and batter persons and/or use unnecessary, deadly, and/or unlawful physical force without reasonable justification. All of these negligent acts proximally caused the injuries suffered by Plaintiff as described herein.

96.    As a proximate result of the above mentioned conduct of Defendants, and each of them, Plaintiff suffered bruises, abrasions, trauma to his neck and nerve pain that radiates from the C-6 nerve down Plaintiff's right arm to his hand, causing severe pain and suffering.

## JURY DEMAND

97.    Plaintiff hereby demands that a jury be empanelled for the trial of this matter

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

1. For general damages in the amount according to proof at trial;

2. For punitive and exemplary damages against the individual Defendants where applicable and in an amount that is yet to be ascertained;

3. For reasonable attorney fees and costs as provided by statute;

4. For costs of suit incurred herein; and

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS

5. For such other and further relief as the Court deems just and proper.

Dated: February 18, 2019

LAW OFFICES OF ALLEN & MCKERNAN, APC

By: _/s/ Robert K.McKernan___
ROBERT K. McKERNAN
Attorney for Plaintiff

24

COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS